FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAR 0 9 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA

MEMORANDUM & ORDER
08-CR-347 (NGG) (RML)

-against-

MARTIN WEISBERG,

        Defendant.
------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are three motions by the parties related to defendant Martin Weisberg's upcoming criminal trial. Weisberg has moved to dismiss count 11 of the indictment, (see Mot. to Dismiss (Docket Entry # 151)), and the government makes two motions in-limine regarding the admissibility of certain evidence, (see 1st Mot. in-Limine (Docket Entry # 141); 2d Mot. in-Limine (Docket Entry # 146)). Weisberg also seeks an order in-limine pertaining to evidence. (See Resp. in Opp'n to 2d Mot. in-Limine (Docket Entry #153) at 5-6.) Weisberg's motion to dismiss count 11 is DENIED; the government's first motion in-limine is GRANTED; its second motion in-limine is GRANTED in part and DENIED in part; and, in line with Weisberg's request, the court precludes from trail evidence that any of Weisberg's conduct constituted a violation of his law firm's policies or the relevant rules of professional responsibility.

Because the issue bears on the government's first motion in-limine, the court first addresses Weisberg's motion to dismiss count 11 of the indictment.

Count 11 charges Weisberg with engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 957, and—or in the alternative—with

1

causing such transactions to occur in violation of 18 U.S.C. § 2. The count tracks the statutory language of 18 U.S.C. § 1957. It alleges that Weisberg:

> did knowingly and intentionally engage and attempt to engage in a monetary transaction, in and affecting interstate and foreign commerce, in criminally derived property that was of value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, knowing that the property involved in such monetary transactions represented the proceeds of some form of unlawful activity.

(Indict. at 6-7.) The specific transaction referenced in count 11 involves "Check number 1534 payable to Entity #1, whose identity is known to the Grand Jury, written on Suffolk Bank account number 1818-000\*\*\*-7." (Id. at 7.) The indictment charges that the check was written on June 4, 2007 for $200,000. Following the text of the count, the government cites both 18 U.S.C. §§ 1957 and 2. Section 2 provides, in relevant part, that "[w]hoever willfully causes an act to be done which if performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b).

The government's first motion in-limine reveals much of the evidence supporting count 11. From that motion, it is clear that the check referenced in count 11 was not written by Weisberg, but by the law firm of Russell & Fig, P.C., payable to Russell & Fig's client, TriState Commercial Builders. According to the government, however, Weisberg was the source of the $200,000, having wire transferred the funds to Russell & Fig three days earlier.

Weisberg contends that count 11 must be dismissed because he was not a party to the charged transaction. As refined somewhat in conference on February 28, 2012, his argument is essentially that 18 U.S.C. § 2(b) does not reach the specific transaction charged in count 11 because that Weisberg's wiring of the $200,000 to an account from which Russell & Fig drew its

2

check does not establish causation for the purposes of the statute. (See Tr. at 5-6, 8-9.)

This is not an appropriate stage in the proceeding to raise such an argument.

"It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)); see also United States v. Taylor, 464 F.2d 240, 241-42 n.1 (2d Cir. 1972) (variance between conduct alleged in an indictment and that proved at trial is acceptable as long as there is "no surprise or prejudice" and "the particulars in the indictment are sufficient to protect against double jeopardy" (internal quotation marks omitted)). Thus, an indictment need only notify the defendant of the crimes with which he is charged, and allow him to recognize if he is facing double jeopardy.[1]

Under so lenient a standard, the government's proof at trial need not perfectly track the facts charged in the indictment. Count 11 provides enough notice to Weisberg for the government to be able introduce evidence of additional facts related to willful causation, or even evidence of a direct violation of § 1957.

The viability of the government's theory of section-2(b) causation can be only tested after the government presents its case on count 11.

As part of this case, the government seeks an order in-limine allowing it to introduce

---

[1] The focus of this test on the prohibition of double jeopardy is logical because that prohibition is aimed at preventing the ordeal of trial in the first place and must be enforced from the earliest stage possible in a criminal proceeding. Other protections that are designed to prevent false convictions may be safely invoked later, such as at the close of the government's case or after a jury verdict.

3

certain evidence related to Weisberg's role and conduct as escrow agent to TriState—Russell & Fig's client. (1st Mot. in-Limine at 1.) According to the government, this evidence will prove the following facts: that during the time period that he served as an escrow agent to the alleged victim in this case, SIAM Capital Management, Ltd., Weisberg also agreed to be an escrow agent for TriState; that in accord with this arrangement, TriState transferred $226,000 to Weisberg for Weisberg to hold in escrow; that the signed escrow agreement required Weisberg to place the funds into a segregated non-interest-bearing bank account; but that Weisberg did not abide by the escrow agreement, instead placing the funds into an interest-bearing account; that, immediately after placing the TriState funds in the interest-bearing account, Weisberg withdrew $221,000 of the $226,000 from that account and purchased a Certificate of Deposit ("CD"); that, a short time later, the attorneys representing TriState, Russell & Fig, contacted Weisberg and directed that the funds be released from escrow; that, because Weisberg had used the money to purchase a CD, he did not have the $226,000 on hand; that, to make good on his obligation to TriState, Weisberg transferred $200,000 of the proceeds from his alleged SIAM fraud to Russell & Fig; that Russell & Fig disbursed the funds by check to TriState; that Russell & Fig then pressed Weisberg for the balance of the escrow funds—$26,000, less Weisberg's agreed upon agent's fee; and that Weisberg responded by closing the CD, moving its proceeds to the interest-bearing account, and remitting an additional $20,000 to Russell & Fig. In short, according to the government, the evidence will show that Weisberg sought to defraud TriState in much the same way that he is alleged to have defrauded SIAM, and that the two frauds are related in the sense that Weisberg used funds embezzled from SIAM in part to cover up his fraud against TriState.

The government argues that this evidence ("TriState Evidence") is directly relevant to

4

count 11, and is also probative of Weisberg's intent and knowledge with respect to all of the crimes charged in the indictment. It also contends that should Weisberg raise some other type of "good faith" defense, with the hopes of creating a reasonable doubt as to his mens rea, the TriState Evidence would be relevant to the issue of mistake.

Weisberg counters that the TriState Evidence is essentially just propensity evidence, and therefore inadmissible under Rule 404(b) of the Federal Rules of Evidence. In the alternative, he argues that, to the extent the TriState evidence is relevant for non-propensity purposes, it is so unfairly prejudicial as to warrant preclusion under Rule 403.

Under Rule 404(b), evidence of a defendant's uncharged crimes or other bad acts may not be introduced at trial as proof of the defendant's propensity to commit crimes. See Old Chief v. United States, 519 U.S. 172, 181-82 (1997).

Such evidence may be admissible, however, when offered for other purposes. Bad-act evidence is not barred by Rule 404(b) if it is itself evidence of the crime charged in the indictment; if, for example, it "is necessary to complete the story of the crime on trial," United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000), or if it tends to prove or negate a defendant's mental state. See generally Fed. R. Evid. 404(b)(2). When offered for a proper purpose, bad-act evidence is admissible as long as the purpose is relevant to an issue actually disputed at trial and the evidence passes Rule 403's well-known balancing test. See United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003). To survive the balancing test, bad-act evidence may need to be accompanied by a limiting instruction. See id.

Weisberg is wrong that the TriState Evidence goes only or primarily to propensity. While it does indeed reflect on Weisberg's propensity to commit fraud, the TriState Evidence is also

5

probative of several legitimate facts that the government must establish in order to obtain a conviction. First, the TriState Evidence is both direct and contextual evidence of the crime charged in count 11. Second, it is relevant to Weisberg's mental state with respect to the remaining counts.

Most of the TriState Evidence is integral to the government's case on count 11. The theory behind the charge in count 11 is that a transaction between Russell & Fig and TriState may be imputed to Weisberg, and that—when taken in conjunction with Weisberg's mental state at the time—this transaction was a crime. To obtain a conviction based on this theory, the government must prove beyond a reasonable doubt that Weisberg "willfully caused" Russell & Fig to write the check to TriState. See 18 U.S.C. § 2(b). Obviously, evidence of the business relationship between Weisberg, TriState, and Russell & Fig will be highly relevant to this inquiry. The jury will need to understand the existence and nature of Weisberg's obligation to TriState and also Russell & Fig's role as an intermediary between the two parties.

To the extent that portions of the TriState Evidence do not directly bear on the issue of willful causation, such evidence is needed to "complete the story" of Weisberg's alleged § 1957 violation. An important element of § 1957 is the knowing use of criminally derived proceeds. Assuming that the government can prove that the $200,000 Weisberg wired to Russell & Fig from the SIAM account constitute such proceeds, the jury is entitled to hear evidence about the reasons why Weisberg used the SIAM proceeds rather than the TriState escrow funds to pay Russell & Fig. Evidence that the TriState funds were inaccessible to Weisberg at the time because he had improperly invested them in a CD is highly relevant to this inquiry. Similarly, evidence of Weisberg's subsequent payment of the remainder of the TriState escrow funds helps

6

to explain the discrepancy between the amount of money with which Weisberg was entrusted and the size of the initial Russell & Fig wire transfer.

The TriState Evidence is also relevant to the issue of whether Weisberg possessed the requisite mens rea to commit wire fraud. As noted above, the government wants to offer the TriState Evidence in part to show that Weisberg's management of the SIAM escrow account was intended to mislead and, ultimately, defraud SIAM.[2] The TriState Evidence is probative of intent because it tends to negate Weisberg's planned defense that he believed an individual at SIAM authorized him to place the SIAM escrow funds into an interest-bearing account—notwithstanding the language of the escrow agreement—and then commingle the interest proceeds from those funds with his personal assets. That is, everything else being equal, the TriStar Evidence makes it less likely that Weisberg managed SIAM's funds in good faith. The reasoning is fairly simple. A defendant's intent to obtain a given result may be inferred from acts that—in fact—yield that result. This inference is strengthened when there is evidence that

---

[2] There is no question that Weisberg's intent—and, by extension, his knowledge and lack of mistake—will be disputed at trial. Weisberg states that his defense will be that he "was authorized to borrow the interest on the SIAM escrow by an individual with actual or apparent authority to give such approval." (Resp. in Opp'n to 1st Mot. in-Limine (Docket Entry # 152) at 7.) Such a defense implicitly denies any intent to defraud SIAM or knowledge that his actions concerning SIAM's escrow funds were improper. Additionally, should Weisberg's defense drift into the related argument that he mistakenly believed he was authorized to borrow the interest, then the honesty of this mistake would also be at issue.

For these reasons, Weisberg's argument to the contrary—that his mental state will not be at issue because he "knew that he was deploying the interest on the SIAM escrow for purposes unrelated to SIAM in connection with the charged transfers, (id. at 6)—is unpersuasive. The government is not charging Weisberg with simply making certain wire transfers; it is charging him with devising "a scheme and artifice to defraud." (Indict. at 4.) This is why the indictment includes reference not only to Weisberg's withdrawals from the SIAM escrow account but also to alleged misrepresentations Weisberg made by email to officials at SIAM. It is irrelevant that Weisberg knew that he was transferring funds out of SIAM's account; what matters is what Weisberg knew about his authorization to make those transfers. The charges in counts 1 through 10 turn on Weisberg's mental state with respect to the overall scheme, not his intent to engage in small constituent acts in furtherance of the scheme.

7

the defendant has, on <u>another</u> occasion, achieved the same result following the same type of acts. In other words, where a defendant has experienced the consequences of certain acts in the past, a jury may more readily find that he intended those consequences when he repeats those acts. See generally Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:34 (3d ed. 2007). In this case, a jury could infer that Weisberg intended to defraud SIAM based on evidence that his management of SIAM's escrow funds was contrary to the relevant escrow agreement and that, at least some, officials at SIAM were deceived by this practice. Evidence that a similar management strategy at TriState led to similar deception at TriState strengthens this inference.

There is no denying that introduction of the TriState Evidence carries with it a threat of unfair prejudice. To infer that Weisberg intended to defraud SIAM because there is evidence that he also defrauded TriState is close to reasoning that Weisberg is guilty as charged because he has a propensity to embezzle money from his clients. On a more general level, the TriState Evidence simply reflects poorly on Weisberg's character.

These risks are always present, however, when evidence of other bad acts is allowed for non-propensity purposes. The court concludes that, at least when accompanied by an appropriate limiting instruction, the risk of unfair prejudice presented by the TriState Evidence is substantially outweighed by its probative value. Because the TriState Evidence is integral to the government's case on count 11, and because it is highly probative of the intent behind Weisberg's dealings with SIAM, the court will allow the government to introduce the TriState Evidence for these purposes. Prior to trial, however, the parties should submit proposals for a limiting instruction that will accompany the introduction of the TriState Evidence.

In its second motion in-limine, the government seeks to preclude Weisberg from

8

introducing evidence of his repayment to SIAM of the allegedly embezzled interest proceeds in December 2007 ("Repayment Evidence"). According to the government, the Repayment Evidence will show that, after the principal of SIAM's escrow funds was transferred to the account of SIAM's new escrow agent in Fall 2007, Weisberg wired an additional $366,755.15 in interest from the original escrow account to the new agent; and that, subsequently, Weisberg and his wife transferred an additional $1.357,318.10 to the agent. The government agues that this evidence is not relevant to the offenses charged in the indictment because the charged crimes were complete at an earlier point in time.

This argument fails to account for the fact the Repayment Evidence is relevant to Weisberg's planned defense. As noted above, Weisberg will argue that he was authorized to place SIAM's escrow funds in an interest-bearing account and to siphon off the interest for his own personal use. According to Weisberg, the arrangement was a type of loan, and—as with any loan—Weisberg was obligated to repay the money he borrowed. Evidence that Weisberg did eventually return the interest proceeds to SIAM is directly relevant to the question of whether a loan agreement between Weisberg and SIAM in fact existed; and evidence of a valid loan agreement is, of course, relevant to the intent behind Weisberg's management of the SIAM escrow funds.

The Repayment Evidence cannot be introduced in a vacuum, however. Just as the jury is entitled to hear evidence about additional details related to Weisberg's $200,000 wire transfer to Russell & Fig, it should also be provided information about the context in which Weisberg repaid the interest proceeds to SIAM. As part of its second motion in-limine, the government requests that—should its motion to preclude Repayment Evidence be denied—it be allowed to

9

present evidence of some of the events leading up to Weisberg's repayment of interest proceeds. The government's theory is that Weisberg repaid SIAM the money that he had transferred out of the escrow account because it was highly likely that his withdrawals would be discovered. As proof, it seeks to introduce evidence that:

> the defendant was indicted in another fraud case; that upon learning of the charges SIAM acted swiftly to alter its escrow arrangements; that Weisberg was barred from Baker & McKenzie [his law firm] and his legal work was placed under scrutiny; that Weisberg initially returned the principal amount of the escrow to SIAM but not the interest; that several weeks later Weisberg mentioned the existence of interest on the account; and that several weeks after that Weisberg returned the $1.3+ million in interest that he had stolen over the prior sixteen months.

(2d Mot in-Limine at 4-5.) Such evidence is highly relevant to determining Weisberg's motive to repay the interest proceeds, see Fed. R. Evid. 404(b)(2), and by extension the existence of a loan agreement. It would allow the government to argue that Weisberg did not repay SIAM as part of a loan agreement, but rather that he repaid the interest proceeds because his embezzlement of SIAM's funds was sure to be discovered and he wanted to curry favor with the victim. If Weisberg introduces the Repayment Evidence, the government may respond with evidence of the events preceding the repayment.

This contextual evidence need not go into great detail about the nature or merit of the indictment or investigation to be probative. Indeed, explicit reference to Weisberg's other indictment or to the details of the Baker & McKenzie investigation would tend to confuse jury and could inject unfair prejudice into the proceeding. Thus, Weisberg is correct that, to avoid this risk, evidence of either Baker & McKenzie's ethical policies or the New York Rules of Professional Conduct must be precluded. Similarly, and responsive to Weisberg's concerns

10

expressed at conference (see Tr. at 11-22), the government is precluded from introducing evidence of Weisberg's other indictment or his alleged conduct underlying the indictment and the Baker & McKenzie's investigation. Evidence that: (1) Weisberg was subject to a government investigation; and (2) this investigation triggered the transfer of the SIAM escrow funds to a new agent, and an internal investigation by Baker & McKenzie into Weisberg's legal work, is sufficient to provide the government with a rebuttal to the Repayment Evidence. As with the TriState Evidence, the parties should propose a limiting instruction to accompany the introduction of evidence of the investigations.

For the foregoing reasons, Weisberg's motion to dismiss count 11 is DENIED; the government's first motion in-limine—to admit the TriState Evidence—is GRANTED; and the government's second motion in-limine is DENIED insofar as it seeks to preclude the Repayment Evidence, but is GRANTED as to its request to introduce certain evidence of events leading up to Weisberg's repayment. By the start of trial, the parties should submit proposed limiting instructions to accompany the introduction of the TriState Evidence and evidence rebutting the Repayment Evidence.

SO ORDERED.

Dated: Brooklyn, New York
March _8_, 2012

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge